IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
------------------------------
                            :
SANDRA W. FOX,              :
                            :           HON. JEROME B. SIMANDLE
            Plaintiff,      :
                            :           Civil No. 09-5538 (JBS/KMW)
      v.                    :
                            :
DREAM TRUST and LOUIS V.    :              OPINION
GRECO, JR.,                 :
                            :
            Defendants.     :
                            :
------------------------------
```

APPEARANCES:

Jennifer L. Bougher, Esq.
ARENT FOX, LLP
1675 Broadway
New York, NY 10019
      Counsel for Plaintiff

Michael L. Rich, Esq.
PORZIO, BROMBERG & NEWMAN, PC
100 Southgate Parkway
Morristown, NJ 07962
      Counsel for Defendants

**SIMANDLE**, District Judge:

I.   **INTRODUCTION**

This matter involving a loan transaction is before the Court

on the motion of Defendants Dream Trust and Louis V. Greco, Jr.

to dismiss Count VI of the Complaint for failure to state a claim

under the Securities Exchange Act and to dismiss the remaining

state law claims for lack of personal jurisdiction and improper

venue [Docket Item 5].  In the alternative to dismissal,

Defendants ask the Court to transfer the case to the United

States District Court for the Eastern District of New York.  As
explained in today's Opinion, the Court will dismiss the
securities claim for failure to state a claim under Rule
12(b)(6), Fed. R. Civ. P., and retain jurisdiction over the state
law claims which will not be transferred.

**II.   BACKGROUND**

The claims in this suit arise out of a one million dollar
loan that Plaintiff, Sandra W. Fox, provided to Defendant Dream
Trust on September 22, 2008.  (Compl. ¶ 6.)  Plaintiff alleges
that the loan was not repaid and that various representations
made in soliciting the loan violate New Jersey common law and the
federal securities statutes.  The Court has federal question
jurisdiction over Plaintiff's federal securities claim, <u>see</u> 28
U.S.C. § 1331, as well as diversity jurisdiction over all claims
pursuant to 28 U.S.C. § 1332(a)(1) since the parties are diverse
in citizenship and the amount in controversy is greater than
$75,000.

The one million dollars Plaintiff loaned to Dream Trust was
to be added to funds raised by Dream Trust and then given to SDS
2008, LLC, to finance a real estate deal.  The Complaint and
Plaintiff's briefing do not present the full scope of the real
estate deal as Plaintiff now understands it, nor do they relate
if and how the entire deal was represented to Plaintiff or her
agent at the time of the loan.  Instead, the Complaint refers to

2

only one part of the deal even though the alleged misrepresentations made with respect to the loan, which are quoted in the Complaint, all occurred in the context of the entire deal.

Based on the documents relied upon in the Complaint and presented by Defendants, as well as the public records submitted by Defendants, it appears that the deal involved SDS 2008's $10,000,000 purchase of two properties in Brooklyn at Columbia Street and Congress Street. (Greco Decl. Ex. C. at 1.) Dream Trust would play some role in financing the acquisition, and in return would obtain a mortgage on the properties. (Greco Decl. Ex. C. at 1; Ex. F at 1.)

The loan in question in this case was to be made to Dream Trust, but ultimately given to SDS 2008 to finance its activities, and was pitched to Plaintiff's agent as a short-term solution to a cash-flow problem that SDS 2008 was having with respect to the real estate deal. (Greco Decl. Ex. C. at 1.) The apparent reason for the selection of the Fox family as likely financiers is that they were interest holders in SDS 2008, having invested $1.5 million in the company on July 25, 2008, more than $500,000 of which belonged to Plaintiff. (Compl. ¶¶ 19-20.)

Tacie Fox, Plaintiff's daughter, is her agent and investment manager. (Id. ¶ 1.) Defendant Louis Greco is the manager of SDS 2008 as well as the sole trustee of Dream Trust. (Id. ¶¶ 3, 15.)

3

The securities claim at issue in this motion focuses on representations regarding Plaintiff's loan made in the days before the loan agreement was made, including a phone call and two e-mails between Tacie Fox and Defendant Greco, as well as a phone call from Mr. Greco's lawyer to Tacie Fox.

According to the Complaint, on September 21, 2008, Mr. Greco telephoned Tacie Fox to tell her that the Fox family would lose its $1.5 million equity investment in SDS 2008 unless they provided $1 million to the Dream Trust by September 22, 2008. (Id. ¶¶ 21, 39.)  No further allegations about that phone call are made in the Complaint.

An email of September 21, 2008 from Mr. Greco to Tacie Fox states that the Columbia-Congress real estate deal was going to fall through unless temporary financing could be arranged before the closing on September 23, 2008.[1]  (Greco Decl. Ex. C at 1.) It is apparent from the email and the September 22 email that Tacie Fox was familiar with at least the broad outline of the Columbia-Congress deal, though neither email lays out the details of the transaction.[2]  The September 21 e-mail indicates that "we

---

[1]  The Complaint relies upon excerpts of the emails of September 21 and 22, 2008 from Defendant Greco to Tacie Fox (Compl. ¶¶ 40, 41), making them relevant to this motion.

[2]  For example, in a September 22 e-mail, with the subject line "Re: Columbia-Congress," Tacie Fox asks what the terms of the restructure on the Congress Street property would be, presumably referring to the other half of the Columbia-Congress deal, and she asks about the timing of the requirement for the

have already paid $3,250,000 of the $10,000,000 purchase price to the seller," and that an additional $6,750,000 will be due at closing. (<u>Id.</u>)

The email indicates that Mr. Greco would be unable to come up with the amount needed at closing in time. He states that he has "subsequently renegotiated the deal so that we will take title only to the Columbia Street Property," and that therefore only $2.9 million will need to be raised before the previously scheduled closing date to keep the deal on track, and that the closing will be adjourned. (<u>Id.</u>) Mr. Greco writes in the email that he has "arranged for $900,000 of additional capital from our internal sources," and proposes that "the remaining $2,000,000 be funded by $1MM by you and $1MM by the Dream Trust in the form of a loan that will be secured by the first mortgage on Columbia Street which has been appraised in excess of $3.3MM." (<u>Id.</u>) It is unclear whether the $900,000 was in the possession of SDS 2008, to which Dream Trust would add a loan of $2 million, or whether the loan to SDS 2008 would be in the amount of $2.9 million because Dream Trust would be adding an additional $1 million to the $900,000 it had. It is also unclear how exactly the mortgage would secure the loan.

On September 22, 2008, Plaintiff loaned $1 million to Defendant Dream Trust. (Compl. ¶¶ 7, 21.) The next day, Dream

_____

remaining $3.8 million.

Trust was assigned a $5,343,000 mortgage note on the Columbia
Street and Congress Street properties from Citibank Mortgage,
(Compl. ¶ 23), and SDS 2008 acquired the title to the Columbia
Street Property through its subsidiary, SDS Columbia LLC.  (Greco
Decl. Ex. G at 1.)

Defendants have allegedly defaulted on the loan and failed
to pay back Plaintiff's principal and any interest owed to her.
Plaintiff claims that the loan was induced by fraud, because
Defendants misrepresented (1) the amount of the loan given to SDS
2008 to which her contribution would be added ($2 million vs.
$2.9 million); (2) how Plaintiff's money would be used (purchase
of title vs. assignment of mortgage); (3) when Defendants would
record the mortgage securing the loan; and (4) their ability to
repay the loan.  (Compl. ¶ 70.)  Plaintiff brings a federal
securities fraud claim against Defendants under Section 10(b) of
the Securities Exchange Act ("Exchange Act"), 15 U.S.C. § 78(j),
and Rule 10b-5 of the Securities and Exchange Commission ("SEC"),
17 C.F.R. § 240.10b-5, along with numerous state law claims,
including money lent (Count I), conversion (Count II), money had
and received (Count III), fraud (Count IV), negligent
misrepresentation (Count V), and violation of Section 49:3-71(a)
of the New Jersey Uniform Securities Law (Count VII).  Plaintiff
seeks both compensatory and punitive damages.

Defendants move under Rule 12(b)(6) of the Federal Rules of Civil Procedure for the Court to dismiss Plaintiff's federal securities fraud claim for failure to state a claim upon which relief can be granted.  In support of their motion, Defendants contend that the instrument in question was not a "security" as defined under the Exchange Act, and even if it was, that Plaintiff has failed to meet the stringent pleading requirements for such a claim.  Defendants further move for the Court to dismiss the case in its entirety under Rules 12(b)(2) and 12(b)(3) of the Federal Rules of Civil Procedure for lack of personal jurisdiction and improper venue.

## III. DISCUSSION

### A.  Personal Jurisdiction and Venue

Plaintiff asserts personal jurisdiction over Defendants based on the nationwide service of process provision provided in 15 U.S.C. § 78aa, which has been interpreted to provide personal jurisdiction in any district court for a securities claim against any defendant with minimum contacts with the United States.  See, e.g., Equidyne Corp. v. Does, 279 F. Supp. 2d 481 (D. Del. 2003) (citing Max Daetwyler Corp. v. R. Meyer, 762 F.2d 290, 295 (3d Cir. 1985)).  Plaintiff asserts pendent personal jurisdiction over the state law claims based on the jurisdiction granted under § 78aa.  See IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1056-57 (2d Cir. 1993) ("[U]nder the doctrine of pendent personal

7

jurisdiction, where a federal statute authorizes nationwide
service of process, and the federal and state claims 'derive from
a common nucleus of operative fact,' the district court may
assert personal jurisdiction over the parties to the related
state law claims even if personal jurisdiction is not otherwise
available."); <u>Robinson v. Penn Central Co.</u>, 484 F.2d 553, 555
(3d Cir. 1973).

Defendants assume that if Plaintiff's securities law claim
is dismissed under Rule 12(b)(6), then the Court will lack
personal jurisdiction with respect to the state law claims.
However, the doctrine of pendent personal jurisdiction is unclear
about what happens when the claim upon which pendent personal
jurisdiction hangs is dismissed.  In the analogous context of
supplemental subject matter jurisdiction, a court has the
discretion to maintain jurisdiction in such a case.  <u>See</u> 28
U.S.C. § 1367.  And, as in the case of supplemental subject
matter jurisdiction, although a party cannot take advantage of
the jurisdictional provision by offering a frivolous or entirely
baseless securities claim, the mere dismissal of the claim does
not strip the Court of jurisdiction.  <u>Republic of Panama v. BCCI
Holdings (Luxembourg) S.A.</u>, 119 F.3d 935, 942 (11th Cir. 1997)
("[I]nsofar as an asserted federal claim is not wholly immaterial
or insubstantial, a plaintiff is entitled to take advantage of
the federal statute's nationwide service of process provision.").

The Court need not reach the question of what happens to pendent personal jurisdiction when the main claim is dismissed, however, because even absent pendent personal jurisdiction this Court still has personal jurisdiction over Defendants because the Complaint alleges facts to show that Defendants' purpose was for their allegedly injurious communications to reach Plaintiff in New Jersey.  Federal Rule of Civil Procedure 4(e) makes this Court's jurisdiction co-extensive with that of New Jersey state courts, which extend it to the maximum range permitted by the Constitution.  Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004).  The Due Process clause requires that Plaintiff establish that the Defendants have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  Int'l Shoe v. Washington, 326 U.S. 310, 316 (1945); Pinker v. Roche Holdings Ltd., 292 F.3d 361, 368 (3d Cir. 2002).  A plaintiff attempting to establish jurisdiction based on sporadic contacts related to the cause of action must show "that the cause of action arose from the defendant's forum-related activities." Mellon Bank (EAST) v. DiVeronica Bros., 983 F.2d 551, 554 (3d Cir. 1993).[3]

---

[3]  Plaintiff concedes that this Court lacks general jurisdiction over Defendants.

According to the Complaint, Defendants directed their communications to Tacie Fox with the purpose of soliciting Plaintiff (among others), and they knew that their representations were being communicated to Plaintiff in New Jersey before the loan deal was consummated because Tacie Fox told them so.  (Compl. ¶¶ 41-46.)  These allegations are reasonable inferences from the facts pled in the Complaint. (Id.)  Defendants knew they were making a deal with a resident of New Jersey, and so the Court has personal jurisdiction over Defendants with respect to Plaintiff's state law claims concerning that deal.  This is sufficient "purposeful availment" of the forum to ensure that Defendants are not being "haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts," and to satisfy the requirements of fair play and substantial justice.  See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985) (describing test for specific jurisdiction) (internal citations and quotations omitted).

Venue is proper for similar reasons.  There is venue in a securities case "where a defendant causes false or misleading information to be transmitted into a judicial district, even if the defendant never has been physically present in that district."  Oxford First Corp. v. PNC Liquidating Corp., 372 F.

10

Supp. 191, 197 (E.D. Pa. 1974).[4]  Even if the Court does not
apply pendent venue to the state claims based on the venue-
granting provision of the securities law,[5] the ordinary venue
statute would place venue in New Jersey.  28 U.S.C. § 1391.
Plaintiff's claims involve the disposition of the loan moneys
transferred from New Jersey and the note that a New Jersey
domiciled Plaintiff holds that was executed between her and the
parties in New York.

To the extent that the claims arise out of the negotiations
regarding the loan, an injurious misrepresentation knowingly
conveyed through a third party to a party within the forum is
sufficient to make this forum the proper venue under 28 U.S.C. §
1391(a)(2) as "a judicial district in which a substantial part of
the events or omissions giving rise to the claim occurred."  The
claim did not arise, if at all, until the allegedly injurious

_____

[4]  Defendants attempt to distinguish this case, arguing that
because it involved publication in the forum it was more
obviously an example of directing communications to the forum.
However, the Court in Oxford was quite clear that the relevant
fact was not where the information was published, but that the
"defendants knew or had reason to know their allegedly false
information would be read and relied upon by potential
plaintiffs" in the forum, regardless of whether the defendants
directed communications there.  Id. at 197-98.

[5]  See CIBC World Markets, Inc. v. Deutsche Bank Securities,
Inc., 309 F. Supp. 2d 637, 649 (D.N.J. 2004) ("Because the
District of Minnesota would have been the proper venue for
resolution of CIBC's claims under the Securities Exchange Act, it
would also be proper for the pendent state claims in the
Complaint.").

communications reached Plaintiff in New Jersey.  The Court finds
no relevant distinction for venue purposes between calling or
emailing Plaintiff in New Jersey and calling or emailing
Plaintiff's agent with the purpose that those representations be
communicated to Plaintiff in New Jersey.  Venue requirements
"ensure that a defendant is not haled into a remote district,
having no real relationship to the dispute." Richards v. Aramark
Services, Inc., 108 F.3d 925, 928 (8th Cir. 1997).  New Jersey
has a significant relationship to the dispute and venue is proper
here.

### B. Motion to Dismiss

Plaintiff alleges that she relied on misrepresentations that
Defendant Greco in his capacity as trustee of Defendant Dream
Trust and Warren Forman, counsel to Defendant Dream Trust at the
time, made in connection with the $1 million loan.  Plaintiff
contends that these misrepresentations violated Section 10(b) of
the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5 of the SEC,
17 C.F.R. § 240.10b-5.  Defendants move to dismiss the claim,
arguing that the loan transaction did not involve a security, and
that the Complaint fails to state a claim even if a security was
involved.

### 1.   Standard of Review

12

In addition to alleging facts sufficient to demonstrate that the transaction in question involved a security, an investor's claim under Section 10(b) of the Exchange Act and Rule 10b-5 must be supported by allegations showing: (1) a material misrepresentation or omission; (2) scienter (i.e. – a wrongful state of mind); (3) a connection with the purchase or sale of the security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) a causal link between the material misrepresentation and economic loss.  Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 157 (2008).

Allegations regarding these elements must comply with the pleading standards set forth in Rule 9(b) and the Reform Act.  In re Rockefeller Center Props, Inc. Sec. Litiq., 311 F.3d 198, 217 (3d Cir. 2002).  "Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of securities fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story' – that is, the 'who, what, when, where, and how' of the events at issue."  In re Rockefeller, 311 F.3d at at 217 (citing In re Burlington, 114 F.3d at 1422).  The Reform Act further requires that Plaintiff "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with

particularity all facts on which that belief is formed."  15
U.S.C. § 78u-4(b)(1).

     "[When] faced with a Rule 12(b)(6) motion to dismiss a §
10(b) action [under the Exchange Act], courts must, as with any
motion to dismiss for failure to plead a claim on which relief
can be granted, accept all factual allegations in the complaint
as true."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S.
308, 322 (2007).  "[C]ourts must consider the complaint in its
entirety, as well as other sources courts ordinarily examine when
ruling on Rule 12(b)(6) motions to dismiss, in particular,
documents incorporated into the complaint by reference, and
matters of which a court may take judicial notice."  Id.
"[T]o survive a motion to dismiss, a complaint must contain
sufficient factual matter, accepted as true, to 'state a claim to
relief that is plausible on its face.'"  Ashcroft v. Iqbal, 129
S. Ct. 1937, 1949 (2009); Fowler v. UPMC Shadyside, 578 F.3d 203,
210 (3d Cir. 2009).


               2. Plaintiff's Note Is A Security
     By enacting the securities laws, Congress sought to
"regulate investments, in whatever form they are made and by
whatever name they are called."  Reves v. Ernst & Young, 494 U.S.
56, 61 (1990) (internal quotation omitted).  The Exchange Act
defines "security" broadly to include any number of financial
instruments constituting investments, including "any note" and

transactions constituting an "investment contract."  15 U.S.C. §
78c(a)(10).[6]  Congress recognized "the virtually limitless scope
of human ingenuity" in arranging commercial transactions, and
decided that the best way to protect investors was to define
"security" in "sufficiently broad and general terms so as to
include within that definition the many types of instruments that
in our commercial world fall within the ordinary concept of a
security."  <u>Reves v. Ernst & Young</u>, 494 U.S. 56, 60-61 (1990).

The issue presented by this case is whether a short-term
"bridge loan," needed to fill a temporary gap in the capital
necessary to invest in a real estate transaction constituted the
sale of a security, when the transaction involved an individual
loaning money who had pre-existing interests in the success of
the real estate investment.  A short-term commercial loan used to
remedy a cash-flow problem is typically viewed as a non-security.
<u>Banco Espanol de Credito v. Security Pacific Nat. Bank</u>, 973 F.2d
51 (2d Cir. 1992) ("It is well-settled that certificates
evidencing loans by commercial banks to their customers for use
in the customers' current operations are not securities.").
However, such transactions usually occur between sophisticated
commercial entities, involve current operations rather than

_____

    [6]  A note is "a certificate that evidences a promise to pay
a specified sum of principal and interest to the payee at a
specified time."  <u>See, e.g.</u>, <u>Sanderson v. Roethenmund</u>, 682 F.
Supp. 205, 206 (S.D.N.Y. 1988).

substantial new investments, and do not involve a loan
participant who has a pre-existing investment interest in the
subject matter of the loan.  See, e.g., id.; American Fletcher
Mortg. Co., Inc. v. U.S. Steel Credit Corp., 635 F.2d 1247 (7th
Cir. 1980).

Defendants correctly characterize the transaction between
Plaintiff and Defendant in this case as a so-called "loan
participation agreement" — a contract whereby one provides part
of the financing for a loan in return for interest on the
principal as well as a stake in the collateral securing the loan.
But Defendants mischaracterize the precedent examining whether
such transactions involve securities.  Contrary to Defendants'
position that such transactions are analyzed solely as potential
investment contracts, the precedent views such agreements as
constituting both a note that is potentially a security and an
agreement that is a potential investment contract.  See, e.g.,
American Fletcher, 635 F.2d at 1251; Provident Nat. Bank v.
Frankford Trust Co., 468 F. Supp. 448, 451 (E.D. Pa.  1979).[7]
This is the correct approach, but all but one of the cases cited

_____

[7]   Notes and investment contracts are analyzed differently.
Compare Reves v. Ernst & Young, 494 U.S. 56, 60-61 (1990)
(defining which notes constitute securities) with SEC v. W.J.
Howey Co., 328 U.S. 293 (1946) (defining investment contracts).
Defendants' mistake is perhaps a result of the fact that, in
these two principal cases, the courts did not reach the question
of whether the notes constituted securities because the parties
had agreed that they did not.

by Defendants applied overruled or outdated law.  <u>See Reves</u>, 494
U.S. at 64-65 (adopting "family resemblance" test over
"investment-commercial" test for notes); <u>S.E.C. v. Edwards</u>, 540
U.S. 389, 394 (2004) (holding that an investment contract with a
fixed return can still be security).  And the one post-1990 case
cited by Defendants is <u>Banco Espanol de Credito v. Security
Pacific Nat. Bank</u>, 973 F.2d 51 (2d Cir. 1992), which applied the
<u>Reves</u> test to the underlying note in a loan participation
agreement finding that it resembled "loans issued by banks for
commercial purposes" because it was issued by a bank to another
party to finance current operations.  <u>Id.</u> at 56.  Because of the
change in the law and the unique facts of this case involving an
individual non-commercial lender with a pre-existing interest in
the subject matter instead of an uninterested bank, the approach
but not the holdings of these loan participation agreement cases
guide this Court.

     The Court must first determine whether Plaintiff's note
constitutes a security.  Because it concludes that it does
constitute a security, the Court need not reach the question of
whether the participation agreement itself constitutes an
investment contract even if the note did not.  The Supreme Court
has described a modified version of the Second Circuit's "family
resemblance" test for determining whether a note constitutes a
security.  All notes are presumed to be securities unless they

"bear[] a strong resemblance" to instruments widely held to be

non-security notes.[8]  Such non-security notes include:

> the note delivered in consumer financing, the
> note secured by a mortgage on a home, the
> short-term note secured by a lien on a small
> business or some of its assets, the note
> evidencing a 'character' loan to a bank
> customer, short-term notes secured by an
> assignment of accounts receivable, or a note
> which simply formalizes an open-account debt
> incurred in the ordinary course of business .
> . . [and] notes evidencing loans by commercial
> banks for current operations.

Reves, 494 U.S. at 65 (internal quotations and citations

removed).  The resemblance is judged by four factors: (1) the

motivations of the buyer and seller for entering into the

transaction; (2) the plan of distribution of the instrument; (3)

the reasonable expectations of the investing public; and (4)

whether some factor reduces the risk of the instrument.  Reves,

494 U.S. at 56.  The factors are not elements, each of which must

be met, but are instead points of comparison for the ultimate

determination of "family resemblance."  See Robyn Meredith, Inc.

v. Levy, 440 F. Supp. 2d 378, 384 (D.N.J. 2006).

Defendants do not identify a particular non-security note

which the note in this case is purported to strongly resemble,

but the implication from the cases upon which they rely is that

---

[8]  Moreover, "If an instrument is not sufficiently similar
to an item on the list, the decision whether another category
should be added is to be made by examining the same factors."
Reves 494 U.S. at 67.  Defendants do not propose adding a new
category.

the note resembles "notes evidencing loans by commercial banks
for current operations."  No other enumerated category of note
would seem to apply, and that is the category of note discussed
in loan participation agreements in which the family resemblance
test has been applied.  <u>See, e.g.</u>, <u>Banco Espanol</u>, 973 F.2d at 55.

The first factor to be examined is "the motivations that
would prompt a reasonable seller and buyer to enter into" the
transaction.  <u>Reves</u>, 494 U.S. at 66.  The Supreme Court drew two
broad categories:  on one side, "If the seller's purpose is to
raise money for the general use of a business enterprise or to
finance substantial investments and the buyer is interested
primarily in the profit the note is expected to generate, the
instrument is likely to be a security."  <u>Id.</u>  On the other side,
"If the note is exchanged to facilitate the purchase and sale of
a minor asset or consumer good, to correct for the seller's
cash-flow difficulties, or to advance some other commercial or
consumer purpose, on the other hand, the note is less sensibly
described as a security."  <u>Id.</u>  This factor is especially
important in this case because one of the primary characteristics
of "notes evidencing loans by commercial banks for current
operations," is that the seller wants to finance some ordinary
purchase or business expense rather than a substantial
investment.  <u>See</u> <u>Reves</u>, 494 U.S. at 66 (citing <u>United Hous.</u>
<u>Found., Inc. v.  Forman</u>, 421 U.S. 837, 858 (1975) ("What

19

distinguishes a security transaction . . . is an investment where one parts with his money in the hope of receiving profits from the efforts of others, and not where he purchases a commodity for personal consumption or living quarters for personal use.")).

With respect to this factor, the note in this case does not bear a strong resemblance to a bank loan for current operations. The Complaint alleges facts suggesting that the seller's purpose was to finance a substantial investment and the buyer was interested in both the profit the note is expected to generate, and the underlying investment.[9]  (Compl. ¶¶ 21, 43-45.)  To the extent that the seller is trying to overcome cash-flow difficulties, it is related to raising capital for an investment not for current operations, bringing the transaction closer to the realm of securities.

The second factor is "whether it is an instrument in which there is common trading for speculation or investment."  Reves, 494 U.S. at 66.  This factor is largely neutral.  On one hand, the note in this case was apparently not marketed to anyone but Plaintiff's family, making it resemble an ordinary commercial transaction.  On the other hand, Plaintiff is exactly the kind of individual investor that securities law seeks to protect, a point

_____

[9]  As the Supreme Court notes in Reves, profit includes fixed interest paid on a note, even if it is not keyed to the success of any underlying investment.  Reves, 494 U.S. at 68 n.4.

commonly considered under the second factor because the fact of common trading goes to the level of sophistication of potential buyers.  See McNabb v. S.E.C., 298 F.3d 1126, 1132 (9th Cir. 2002) (finding that second factor involves weighing "the purchasing individual's need for the protection of the securities laws"); Pollack v. Laidlaw Holdings, Inc., 27 F.3d 808, 813 (2d Cir. 1994) (distinguishing Banco Espanol as to the second factor because "the record before us does not suggest that the participations here were restricted to sophisticated investors who had the capacity to acquire information about the debtor."); Stoiber v. S.E.C., 161 F.3d 745, 751 (D.C. Cir. 1998) (finding relevant for the second factor that "Stoiber solicited individuals, not sophisticated institutions.").

    The third factor is "the reasonable expectations of the investing public."  Reves, 494 U.S. at 66.  With this factor, the Supreme Court allows a sort of escape hatch by which instruments are deemed securities "even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not securities as used in that transaction." Id. at 67.  But it operates as a "one-way ratchet," such that failure to satisfy it does not weigh against a finding that a instrument is a security.  See Stoiber v. S.E.C., 161 F.3d at 751.  Plaintiff alleges that she considered herself an investor and that after the deal was completed Defendants also

characterized her as "an investor," by a letter from Defendants'
counsel at the time.  (Compl. ¶ 77.)  This characterization,
although occurring after the transaction, is to at least a slight
degree an admission relevant to Plaintiff's expectations at the
time of investment.  The Court finds this factor to tip slightly
in favor of Plaintiff's position.

The final factor is "whether some factor such as the
existence of another regulatory scheme significantly reduces the
risk of the instrument, thereby rendering application of the
Securities Acts unnecessary."  Reves, 494 U.S. at 66.  There does
not appear to be such a scheme evident here, such as FDIC or
ERISA protections, that make the note resemble one of the
enumerated non-securities.  Cf. Marine Bank v. Weaver, 455 U.S.
551, 558-59 (1982) (finding that a certificate of deposit was not
a security because of federal banking laws).  This factor calls
for examination of other risk-reducing factors, such as
collateralization.  See Bass v. Janney Montgomery Scott, Inc.,
210 F.3d 577, 585 (6th Cir. 2000).  However, there is a dispute
of fact over whether this loan is in fact collateralized,
preventing application of this factor in favor of Defendants at
this procedural stage.  See Pollack v. Laidlaw Holdings, Inc., 27
F.3d 808, 814 (2d Cir. 1994).

In summary, the first factor leans somewhat strongly toward
Plaintiff, while the second and fourth factors are neutral, and

22

the third may lean slightly toward Plaintiff.  Although the
factors do not yield an obvious result, the Court is mindful of
the ultimate question:  whether this note "strongly resembles"
notes evidencing "loans by commercial banks for current
operations."  There is some resemblance, based on the
individualized marketing to Plaintiff and the "bridge" nature of
the transaction.  But, crucially, the loan is not by a commercial
bank, it is not for current operations, it was sold as a way to
protect Plaintiff's pre-existing investments, and the extent to
which it was actually secured is unclear.  The transaction is an
investment by an individual for the purpose of financing another
entity's substantial investment.  Where the question is a close
one, the presumption that the note is a security holds since to
overcome the presumption Defendants must demonstrate a "strong
resemblance."  The Court therefore finds that, based on the
allegations in the Complaint, the note is a security.

A final issue regarding the threshold application of
securities law is whether the note is excluded from being a
security by the language of the Exchange Act which excludes, "any
note . . . which has a maturity at the time of issuance of not
exceeding nine months."  15 U.S.C. § 78c(a)(10).  Defendants
contend that under the language of the Exchange Act this
instrument cannot be a security because it has a maturity of less
than 90 days.  Although neither the Supreme Court nor the Third

Circuit Court of Appeals has decided the issue, it is the
unanimous finding of other Circuit Court of Appeals that have
examined the issue, as well as the SEC itself, that the short-
term note exception applies only to so-called "commercial paper,"
that is, "paper issued to facilitate well recognized types of
current operational business requirements and of a type eligible
for discounting by Federal Reserve banks."  Release No. 4412,
Release No. 33-4412, 1961 WL 61632 (S.E.C. Release No.); Reves,
494 U.S. at 74 (Stevens, J., concurring) ("The Courts of Appeals
have been unanimous in rejecting a literal reading of that
exclusion.").  Defendants provide no reason why the Court should
not follow this unanimous persuasive precedent in determining
that the exception applies only to commercial paper, or any
reason why the loan in question here should be considered
commercial paper.  The Court will not, therefore, dismiss the
claim on these grounds.


          3. The Complaint Contains Insufficient Factual
             Allegations to State a Securities Claim

     Plaintiff asserts that Defendants made a series of
materially false or misleading statements that fraudulently
induced Plaintiff into giving the loan to Dream Trust.  These
assertions include:  (1) that Defendants misrepresented the
participation interest Plaintiff would take in the mortgage
securing the loan; (2) that Defendants used Plaintiff's money for

a purpose other than that represented; (3) that Defendants knew
that they would not record a mortgage until after the maturity
date of Plaintiff's loan and not immediately as promised; and (4)
that Defendants knew that they would not be able to repay the
loan within ninety days as promised given Defendant Dream Trust's
financial situation.  (Compl. ¶ 70.)

For the purposes of the securities law, material information
is "information that would be important to a reasonable investor
in making his or her investment decision." In re Burlington Coat
Factory Sec. Litig., 114 F.3d 1410, 1425 (3d Cir. 1997).  Thus,
"a fact or omission is material only if there is a substantial
likelihood that it would have been viewed by the reasonable
investor as having significantly altered the total mix of
information' available to the investor." In re NAHC, Inc. Sec.
Litig., 306 F.3d 1314, 1330 (3d Cir. 2002).  In addition to
showing that each misrepresentation was material, Plaintiffs must
"state with particularity facts giving rise to a strong inference
that the defendant acted with the required state of mind." 15
U.S.C. § 78u-4(b)(2).  "This scienter standard requires
plaintiffs to allege facts giving rise to a 'strong inference' of
'either reckless or conscious behavior.'" Institutional
Investors Group v. Avaya, Inc., 564 F.3d 242, 267 (3d Cir. 2009)
(quoting In re Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3d
Cir. 1999)).  The Third Circuit Court of Appeals defines a

reckless statement as "one involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  Id. at 267 n.42 (quoting id. at 535).  As explained below, each of the alleged misrepresentations falls short of one or both of these requirements.

### i.  $2 million vs. $2.9 million

Plaintiff alleges that Defendants represented to Plaintiff that her loan "would constitute 50% of a total amount ($2,000,000) to be loaned by Dream Trust to SDS 2008, LLC, when Defendants knew and intended that Fox's loan would constitute a significantly smaller percentage of the total amount ($2,900,000.00)" and that this difference significantly impairs "the loan-to-value ratio."  (Compl. ¶ 8a.)  The only specifically identified representation relating to Plaintiff's claim is the September 21 email which states, "The current funding required is $2.9MM . . . I have arranged for $900K of additional capital from our internal sources.  I propose that the remaining $2,000,000 be funded by $1MM by you and $1MM by the Dream Trust in the form of a loan that will be secured by the first mortgage on Columbia Street which has been appraised in excess of $3.3MM."  (Greco

26

Dec. Ex. C.)  Plaintiff alleges that she understood this to mean that Dream Trust was contributing $1 million total, and Plaintiff was contributing $1 million, and that consequently her note would be secured by a 50% participation interest in the mortgage on the Columbia Street property.

Plaintiff's interpretation is a substantial distance from the actual representation.  Even if one reads the email to mean that Dream Trust was only contributing $1 million instead of $1 million plus $900,000 — a plausible though not necessary reading of the ambiguous text — it is unclear why one should interpret the proposal to mean that Plaintiff would obtain a greater interest in the mortgage than the proportion of her contribution to the purchase of the property.  Indeed, there was no representation that Plaintiff would receive a percentage interest in the mortgage at all.  The only thing represented is that "the loan," which may be referring either to the loan from Dream Trust to SDS or the loan from Plaintiff to Dream Trust, "will be secured by the first mortgage on Columbia Street."  (Greco Dec. Ex. C.)  Plaintiff has not pointed to any specific representation, implicit or explicit, that would lead a reasonable person under the circumstances to believe that Plaintiff was receiving a 50% participation interest in a mortgage encumbering a property purchased for $2.9 million in

exchange for her one million dollar contribution and on top of the interest she expected to receive.

If Plaintiff understood this to be the arrangement, or if this was in fact the arrangement, it must have been based on additional representations not mentioned in the Complaint. Without the Complaint's reference to such additional representations, the Court cannot infer that the perceived misrepresentation in the September 21 email was "either known to the defendant" or "so obvious that the actor must have been aware of it." Institutional Investors Group, 564 F.3d at 267 n.42 (quoting In re Advanta Corp. Sec. Litig., 180 F.3d at 535). Therefore this part of the claim must be dismissed.

ii.  Use of the Loan

Plaintiff asserts that her loan was used to obtain a mortgage on the Columbia and Congress Street properties instead of to permit SDS 2008 LLC to purchase the Columbia Street Property, as represented in the email.  However, the public record indicates that on September 23, 2008, SDS Columbia LLC — an entity which Plaintiff alleges to be a subsidiary of SDS 2008 LLC — became the owner, in fee simple, of the Columbia property. (Greco Decl. Ex. G.)  And the Complaint does not allege otherwise.  So there is an insufficient factual basis for finding that the money was not used as represented.  Moreover, the

28

Complaint does not explain how the difference in the use of the loan proceeds was material to the investment decision since it did not change the interest or security to which Plaintiff would be entitled.  In light of the heightened pleading requirements for such claims, for these two reasons this aspect of the claim will be dismissed.

### iii.  Recording of Mortgage

The Complaint states that Defendants defrauded Plaintiff "by representing to Fox that Defendants would immediately record a mortgage securing Fox's $1,000,000.00 loan, when Defendants knew that they would not record said mortgage until after the maturity date of Fox's loan." (Compl. ¶ 8b.)  This claim is based on the allegation that Defendants' attorney informed Tacie Fox by telephone that "the mortgage would be promptly recorded, thereby ensuring that the Fox loan was secured by the Columbia Street Property." (Id. ¶ 47.)

This aspect of the claim has several problems.  First, it trades on the ambiguity of the phrase "the mortgage."  If Defendants' attorney was referring to the mortgage encumbering both the Columbia Street and Congress Street properties, then the statement was not a misrepresentation by any reasonable definition of "prompt."  On September 23, 2008, Mr. Greco as trustee of Dream Trust was assigned a mortgage encumbering both

29

the Columbia Street and Congress Street properties.  (Greco Decl.
Ex. F at 1.)  The assignment was recorded on October 10, 2008,
roughly two weeks after the September closing date.  (Id.)  On
the same day, the mortgage was split into one encumbering only
the Columbia Property in the amount of $2.9 million, and one
encumbering the Congress Street Property, and the split and new
mortgage were recorded January 5, 2010.  (Defs. Exs. G & I.)
Only if Defendant's attorney was referring to the recording of
the split mortgage could the statement even plausibly be false.

     But even assuming for the sake of argument that a reasonable
reading of the Complaint's allegation is that Defendant's
attorney was referring to the recording of the split mortgage,
Plaintiff does not explain why the January recording should not
be considered prompt, nor why this alleged misrepresentation
would be material.  There is no clear reason why it should matter
to Plaintiff that the $2.9 million substitute first mortgage was
recorded in January.  The recording of a mortgage is relevant
when there are competing claims to priority of a lien, or when
title to an encumbered property is sold to a third party.  But
here, the assignment of the priority mortgage was immediately
recorded.  And given the fact that the title-holder was an entity
controlled by the mortgagee, it is difficult to envision a
scenario in which even that recording date would be relevant.
The Court is unable to see why it would be relevant to the

investment decision that the split, which was duly executed on September 23, 2008, was not recorded until January.

Finally, a third reason for dismissal of this aspect of the claim is that the Complaint does not indicate whether the telephone call between Defendants' counsel at the time and Tacie Fox happened before Plaintiff agreed to make the loan or after. If the conversation occurred afterwards, it cannot have been material. And while it is a reasonable inference from the gravamen of the Complaint that the conversation occurred before the investment decision, this is precisely the kind of detail that heightened pleading requires the Complaint to contain.

iv.  <u>Ability to Repay</u>

Lastly, Plaintiff argues that Defendants knew that they would not be able to repay the loan within ninety days as promised given Defendant Dream Trust's financial affairs. (Compl. ¶ 70.)  Plaintiff asserts in relevant part:

> When defendants made these representations, Defendants had full access to the books, records, and other financial information relating to the entities and properties at issue, which information revealed that the borrower of the $1,000,000 Loan had no income, insufficient equity, and no reasonably foreseeable ability to repay the loan under the represented terms.

(Compl. ¶ 59.)

Plaintiff's factual allegation, that the borrower had "no reasonably foreseeable ability to repay the loan," is

contradicted by the documents relied upon in the Complaint.
Specifically, the September 21 email explains exactly the basis
upon which Mr. Greco expected to be able to repay the loan: an
expected loan from the Bank of East Asia that would be used to
refinance the deal.  That this other source of funding ultimately
fell through does not mean that Defendants misrepresented
anything.  This aspect of the claim therefore fails to identify a
misrepresentation.  If Plaintiff's position is that the
representation in the email regarding the Bank of East Asia loan
is itself false, the basis for this belief is not adequately
explained in the present Complaint.

Overall, the Court finds that these allegations of
misrepresentations fail to state a claim under federal securities
law and Count VI will be dismissed without prejudice.  Any motion
to amend and reinstate Count VI to correct these deficiencies
must be filed within twenty-one (21) days hereof.


4.  Economic Loss

Plaintiff's claim of economic loss is based on the failure
to repay the loan and to pay interest.  (Compl. ¶¶ 24, 54.)
Defendants claim that even if they had made material
misrepresentations upon which Plaintiff relied that Plaintiff did
not suffer any economic loss because "[Plaintiff] holds a
beneficial interest in the Columbia Mortgage which is secured

against the Columbia Street Property, and she is collecting a premium rate of interest on her loan." (Defs.' Mot. to Dismiss 9.) Although the Court finds the allegations regarding material misrepresentations to be insufficient, the Court nevertheless addresses this issue in the event that a proposed amended complaint could overcome the deficiencies in the present complaint.

Whether Plaintiff in fact holds "a beneficial interest in the Columbia Mortgage" that is worth more than the money lost is a question of fact not addressed by public records or the Complaint. As Plaintiff correctly points out, it is not necessary, nor appropriate, for the Court to resolve this factual dispute regarding economic loss at this stage of litigation. Plaintiff has put forward sufficient facts to show that she suffered economic loss in reliance upon Defendants' alleged misrepresentations.

### D.  Transfer to the Eastern District of New York

28 U.S.C. § 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." § 1404(a). The moving party bears the burden of establishing the need for a transfer. <u>Jumara v. State Farm Ins. Co.</u>, 55 F.3d 873, 879 (3d

Cir. 1995).  As explained below, the Court finds that transfer would not be in the interest of justice.

The Court must consider all relevant public and private interests in favor of an opposition to transfer, and not just the three enumerated factors in § 1404(a).  <u>Jumara</u>, 55 F.3d at 879. The private interests include (1) the preferences of the parties; (2) where the claim arose; (3) the convenience of the parties as indicated by their relative physical and financial condition; (4) the extent to which any witnesses might not be available for trial in the chosen forum; (5) the extent to which books and records could not be produced in the chosen forum.  <u>Id.</u> at 879. The public interests include: (1) the enforceability of the judgment; (2) practical considerations of the trial; (3) court congestion; (4) local interest in deciding local controversies; (5) public policies of the fora; (6) and familiarity of the trial judge with the applicable state law in diversity cases.  <u>Id.</u> at 879-80 (citations omitted).  Ultimately, "the plaintiff's choice of forum will not be disturbed unless the balance of interest tilts strongly in favor of a transfer."  <u>Reed</u>, 166 F. Supp. 2d at 1057 (citing <u>Gulf Oil Corp. v. Gilbert</u>, 330 U.S. 501, 508-09 (1947)).  Plaintiff does not dispute that this case could have been brought in Defendants' desired forum, so the question is limited to an examination of the relevant <u>Jumara</u> factors.

The private factors weigh against transfer.  When a
plaintiff chooses her home forum, where she suffered an injury,
that choice is given considerable deference.  Sandvik, Inc. v.
Continental Ins. Co., 724 F. Supp. 303, 307 (D.N.J. 1989).
Defendants argue that the case has no connection to the forum and
that the claims arose elsewhere, but the Court has already
explained why it finds that the action has a meaningful
connection to New Jersey and why the injury occurred in New
Jersey, if anywhere.  Defendants also maintain that because
Plaintiff's testimony will not be critical to ascertaining the
content of representations made to her agent, her convenience in
accessing the forum is outweighed by the other parties' residence
in New York.  But Plaintiff has the right to attend the relevant
hearings and potential trial, so it is not clear why her
convenience is less important than the convenience of Mr. Greco.
The convenience of non-party witnesses also does not persuade the
Court in favor of transfer.  The critical non-party witness is
Tacie Fox, who is a resident of neither forum and slightly closer
to the present forum.  Defendants name several other witnesses
located in Brooklyn who have knowledge of the underlying
transaction, but their importance is not clear to the Court nor
is it clear that they would be unavailable for trial in this

35

forum.[10]  Finally, Defendants identify unspecified books and
records as well as legal papers located in New York, but it is
not clear that significant numbers of business records will be
necessary in this case, and Defendants' counsel in this case is
located in New Jersey.  The Court is confident that Plaintiff's
counsel, herself located in Manhattan, will cooperate with
reasonable requests for the location of depositions and document
production within these adjoining federal districts, so as to
minimize inconvenience to all concerned.

      The public factors are also largely unpersuasive as to
transfer.  The enforcement of any judgment, the relative
congestion of courts, and relative familiarity with the relevant
state law are largely non-factors in deciding between the two
districts, though to the extent they matter at all they weigh in
favor of not transferring the action since Plaintiff brings
claims under New Jersey law and this district is slightly less
congested.  Defendants present no credible argument as to
practical considerations of trial that would differ between the
districts, and Defendants' other arguments rest on the same
flawed premise as above that nothing relevant happened in New

------

      [10]  According to online atlases, all of Brooklyn is within
100 miles of this courthouse (both by road and as a matter of
absolute distance), and therefore within the subpoena power of
this Court under Rule 45(b)(2)(B).  See Rand McNally Maps &
Directions, http://maps.randmcnally.com/.

Jersey and that the forum therefore has no interest in the action.

A Plaintiff who sues in her home forum, regarding money that should have been returned to her in that forum, should not be forced to litigate the matter in an adjacent forum based on a handful of witnesses and books being located in that forum.  The motion to transfer will therefore be denied.


**IV.   CONCLUSION**

The case is properly filed in this Court and this Court has personal jurisdiction over the Defendants based on Defendants' alleged purpose to direct harmful communications to Plaintiff in New Jersey as well as the jurisdiction and venue-granting provisions of the securities law.  While Plaintiff's note is a security, Plaintiff has not sufficiently alleged the kind of knowing or reckless material misrepresentations regarding the investment necessary to give rise to a securities claim.  That claim will therefore be dismissed.  The Court is not, however, persuaded that Plaintiff could not possibly state such a claim. So the Court will grant the motion to dismiss that claim without prejudice to Plaintiff moving to file an amended complaint with additional or clarified allegations within twenty-one (21) days hereof.  See Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004).

Finally, the action will not be transferred as Defendants have not shown that Plaintiff's choice of forum should be displaced. The accompanying Order will be entered.


**September 28, 2010**                    **s/ Jerome B. Simandle**
Date                                      JEROME B. SIMANDLE
                                          United States District Judge